UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK         x


CV 07 . 2488

KEVIN DOWDY, Pro-Se
         Plaintiff

VITALIANO, J.

JURY TRIAL DEMAND

-against-

BLOOM, M.J.

P.A. HERCULES, U.S.P.H.S.
P.A. ANNESSA, U.S.P.H.S.
DR. FRANCIN, M.D., U.S.P.H.S.
DR. BORECKY, M.D., U.S.P.H.S.
DR. R. BEAUDOUIN, M.D. U.S.P.H.S.
DEFENDANT DOE # 1
all of the above at the
Metropolitan Detention Center
in Brooklyn, New York
DR. D. MARINI, M.D., U.S.P.H.S.
K. BRUNO, RN, U.S.P.H.S.
PA-C S. LIBERTY, U.S.P.H.S.
PA-C B. CINK, U.S.P.H.S.
RPA-C B. SHULL, U.S.P.H.S.
E. HUGHES, APRN, DC-FNP, U.S.P.H.S.
E. SWEATT, RPA, ASHA, U.S.P.H.S.
DEFENDANT DOE # 2
DEFENDANT DOE # 3
all of the above at the
Federal Correctional Institution
in Ray Brook, New York
DEFENDANT DOES # 4 to # 25
THE FEDERAL BUREAU OF PRISONS
THE UNITED STATES PUBLIC HEALTH SERVICE
THE UNITED STATES OF AMERICA
         Defendants

VERIFIED COMPLAINT
PURSUANT TO:
28 U.S.C. § 1331
42 U.S.C. § 1983
BIVENS v. SIX UNKNOWN
NAMED AGENTS OF THE
FEDERAL BUREAU OF
NARCOTICS, 403 U.S. 388,
29 L.Ed.2d 619, 91 S.Ct.
1999 (1971)
42 U.S.C. § 1985


RECEIVED
MAY 0 4 2007
PRO SE OFFICE

## SUBJECT MATTER

1) This cause of action is brought to seek relief in the form of menetary damages against the Defendants, for the Defendant's actions as individuals, and for the Defendant's actions in the Defendant's official capacities, that the Defendants deliberately, intentionally, maliciously, negligently and willfully withheld necessary medical treatment of the Plaintiff for the Plaintiff contracting Tuberculosis, in violation of the Eighth Amendment's prohibition against the infliction of cruel and unusual punishment.

2) This cause of action is brought to seek relief in the form of monetary damages against the United States Public Health Services Defendants, for the Defendant's actions as individuals, and for the Defendant's actions in the Defendant's official capacities, for the Defendants committing medical malpractice under the color of authority and law, such actions rising to the level of a Constitutional violation of the Eighth Amendment's prohibition of the infliction of cruel and unusual punishment, in misdiagnosing and deliberately, intentionally, maliciously, negligently and willfully withholding necessary medical treatment of the Plaintiff for the Plaintiff contracting Tuberculosis.

3) This cause of action is brought to seek relief in the form of monetary damages against the Defendants, for the Defendant's actions as individuals, and for the Defendant's actions in the Defendant's official capacities, for the Defendants failing to prevent the violation of the Plaintiff's rights under the Eighth Amendment to the Constitution of the United States' prohibitation against the infliction of cruel and unusual punishment, when the Defendants had the opportunity to prevent such violations and deliberately, intentionally, maliciously, negligently and willfully failed to prevent such violations from occurring.

4)      This cause of action is brought to seek relief in the form of monetary damages against the Defendants, for the Defendant's actions as individuals, and for the Defendant's actions in the Defendant's official capacities, for compensatory, exemplary, general, punitive and special damages, for the Defendant's actions that violated the Plaintiff's rights under the Eighth Amendment's prohibition against the infliction of cruel and unusual punishment.

5)      This cause of action is brought to seek any other relief that that Honorable Court deems to be fair and just.

6)      This cause of action is brought pursuant to 28 U.S.C. § 1331, 42 U.S.C. § 1983, 42 U.S.C. § 1985, <u>Biven v. Six Unknown Named Agents of the Federal Bureau of Narcotics</u>, 403 U.S. 388, 29 L.Ed.2d 619, 91 S.Ct. 1999 (1971) and pursuant to any other Statute, Rule, Regulation, Ordinance or Law that the Honorable Court may deem applies and is actionable herein.

7)      This cause of action <u>does not</u> challenge the validity of the Plaintiff's conviction and <u>does not</u> challenge the validity of the Plaintiff's sentence. This cause of action is <u>not</u> a petition for relief pursuant to Habes Corpus and may not be construed as such. This cause of action seeks only monetary damages for the harms inflicted upon the Plaintiff by the Defendants as enumerated herein.

## **VENUE**

8)      The Eastern District of New York is the correct venue for this cause of action as a number of the incidents that are described herein occurred at the Metrotopolitan Detention Center located at 80 29th Street, Brooklyn, New York, which is located in the Eastern District of New York. The continuing harms the Plaintiff suffered as begun by the Defendants at MDC-Brooklyn occurred at the Federal Correctional Institution at Ray Brook which is located at 128 Ray Brook Road in Ray Brook, New York,

which is located in the Northern District of New York.

9)      28 U.S.C. § 1331. Federal Question, states:

> "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

10)     As this cause of action began in the Eastern District of New York, although several of the Defendants are located in the Northern District of New York, the Eastern District is the correct venue for this cause of action against all of the Defendants.

### PRO-SE PLEADING

11)     The Plaintiff respectfully prays this Honorable Court to construe this cause of action under the latitude delineated by the United States Supreme Court in the Court's decision in Haines v. Kerner, 404 U.S. 519 (1972) by not holding Pro-Se actions to the higher standards of a professional legal practitioner.

### SERVICE ON THE DEFENDANTS BY THE U.S. MARSHAL

12)     In accordance with Rule 4 of the Federal Rules of Civil Procedure, since the Plaintiff is proceeding in forma pauperis, it is respectfully prayed of the Honorable Court to **ORDER** that the United States marshal for the Eastern District of New York serve the Summons, this Verified Complaint, along with any other documents the Honorable Court deems should be served, on the Defendants.

## BACKGROUND OF THE CASE

13) The Plaintiff was arrested on a Federal Arrest warrant on December 27, 2001. After being processed, the Plaintiff was denied bail and housed at the Lackawan County Prison under a contract between the U.S. Marshals and the Prison to house Federal Pretrial Inmates.

14) While housed in the Lackawana County Prison, the Plaintiff was exposed to and contracted Tuberculosis. Although tested by the medical staff at Lackawana, the Plaintiff was not informed of his contracting Tuberculosis until he was moved to MDC-Brooklyn pending designation to a Federal Prison.

15) The contributory actions of the potential Defendants at the lackawana County Prison are not the subject of this cause of action but are the subject of <u>Dowdy v. Donate, et. al.</u>, 4:07-CIV-0863 in the United States District Court for the Middle District of Pennsylvania.

16) On June 18, 2004, after the Plaintiff was sentenced by the United States District Court for the Middle District of Pennsylvania on the criminal conviction, the Plaintiff was taken from the Lackawana County Prison by the U.S. Marshals to Harrisburg Airport and was transferred into Defendant BOP's custody being placed on the bus taking sentenced inmates to MDC-Brooklyn to await designation to the Federal Prison where the inmates will serve their sentences.

17) Upon arrival at MDC-Brooklyn (on 6/18/04), the Plaintiff was examined by Defendant Hercules. As per standard procedure for all new admission to the facility, a "PPD" test was administered to check for Tuberculosis exposure. Although the Plaintiff was displaying outward signs of having contracted Tuberculosis, Defendant Hercules failed to recognize any of these signs (i.e.: coughing, spitting up blood, etc.).

18) On June 20, 2004, the "PPD" test was "read" by Defendant Doe # 1 (reading a "PPD" test involves running one's

finger over the injection point to see if the skin is smooth, or if the skin has raised up. A normal reaction leaves the skin almost smooth, or raised up no more that approximately 2-millimeters). Although the Plaintiff's skin clearly showed that the injection area had raised and expanded to at least 20-millimeters (at least 10-times the normal maximum as is indicated in the Plaintiff's medical file), Defendant Doe # 1 told the Plaintiff that this was probably a reaction to a previous vaccination the Plaintiff received (usually prior to embarking on international travel).

19)     The Plaintiff was taken down to the medical unit for a blood test, and then to see Defendant Francin. Defendant Francin checked the injection area and informed the Plaintiff that it looked positive for Tuberculosis. Defendant Francin ordered an immediate chest x-ray and sent the Plaintiff back to the medical intake unit. The Plaintiff believes that Defendant Doe # 1, who initially "read" the injection site and who brought the Plaintiff down to medical for the blood test and to see Defendant Francin is Defendant Annessa.

20)     Two-days later, on June 22, 2004, the Plaintiff was "medically-cleared" and was moved off the medical intake unit and assigned to pretrial housing unit I-61 on the 6th floor of MDC-Brooklyn (each housing unit has a capacity of 120-inmates, and there are 3-housing units on each floor of the "new" building at MDC-Brooklyn). The Plaintiff was still showing many outward signs of being infected with Tuberculosis, and housing the Plaintiff in a regular pretrial housing unit placed the 360-inmates housed on the 6th floor in danger of contracting this potentially bacteria. This also placed the staff of MDC-Brooklyn (and by extension their families, as well as the families of the visitors to the inmates) in danger as well as being infected with Tuberculosis.

21)     Each night, "pill-line" came to each housing unit at MDC-Brooklyn (pill-line is to dispense medications to the

inmates that need to take such medication(s) under the direct supervision of the medical staff, such as insulin by diabetic inmates, and to dispense new or refills medications that the inmates are allowed to possess and self medicate). At each "pill-line," the Plaintiff voice his complaints to the medical staff member conducting "pill-line" regarding the numerous symptoms the Plaintiff was displaying. Added into this, the Plaintiff placed numerous "sick-call" slips into the box for inmates requesting medical attention. All of the Plaintiff's attempts to receive medical attention were ignored by the medical staff at MDC-Brooklyn.

22) Two weeks passed until Defendant Francin called the Plaintiff back down to medical. the Defendant informed the Plaintiff that it was confirmed that the Plaintiff had in fact contracted Tuberculosis. Defendant Francin asked the Plaintiff if the Plaintiff wanted to start treatment immediately, or if the Plaintiff wanted to wait until the Plaintiff reached the facility the Plaintiff was being designated to serve his sentence at. The Plaintiff clearly and firmly stated that the Plaintiff wanted to start treatment immediately. However, Defendant Francin was not pleased with this answer.

23) Three additional weeks went by without any medication or medical attention being rendered. The medical staff at MDC-Brooklyn were all fully aware that the Plaintiff has been infected with Tuberculosis, and that the Plaintiff was experiencing testicular pains (a definite symptom of Tuberculosis), and that the Plaintiff was still showing outward signs of this infection. Yet the medical staff and the Defendants did not move the Plaintiff from the pretrial housing unit to either the medical intake unit, or to the special isolation unit located in medical. The Plaintiff was left to possibly continue to infect the other pretrial inmates, the staff and possibly their families.

24) Finally, after the passing of these three-weeks, the Plaintiff was taken once more to Defendant Francin. The Defendant informed the Plaintiff that more blood tests were needed before medication could be prescribed to treat the Tuberculosis. The Plaintiff was given forms to sign that Defendant Francin said were consent to treat forms. The next day, the Plaintiff was transferred out of MDC-Brooklyn.

25) After several days "in transit," the Plaintiff arrived at FCI-Ray Brook (which is where the Plaintiff had been designated to serve his sentence). This was on or about July 30, 2004.

26) At intake medical screening, the Plaintiff immediately informed the examinig Physician's Assistant, Defendant Doe # 2, that the Plaintiff had tested positive for Tubercuolsis while at MDC-Brooklyn, and that no treatment had yet been rendered. The Plaintiff also informed Defendant Doe # 2 about the severe testicular pains the Plaintiff was experiancing. The Plaintiff was once more placed into the general population.

27) Approximately foiur more weeks passed without any mdication or treatment being rendered to the Plaintiff. The Plaintiff was in constant contact with his mother, and his mother contacted a Dr. Everlena M. Holmes. Both Dr. Holmes and the Plaintiff's mother constantly contacted FCI-Ray Brook to inquire why the Plaintiff was not receiving medical attention and treatment. Because of these constant inquiries, finally, medication was provided to the Plaintiff to attempt to treat the Tuberculosis.

28) During the couse of the next six-months, the Plaintiff was given various medications to try and treat the Tuberculosis, as well as other physical problems (the testicular pains and for a cyst cause by the TB). For some unknown reason, the testicular pains increased almost immediately after taking the medications.

29)     In response to the increased testicular pains, other medications were prescribed, but did not work. The next step the FCI-Ray Brook Defendants was to prescribe medications that did not have any effect at all on the pains. During this time of medication experimentation, the Plaintiff filed numerous administrative remedies, all to no avail (all relief was denied at each level and the inadequate care and medical malpractice continued unabated).

30)     All of these treatments performed on the Plaintiff at FCI-Ray Brook by the Defendants were done without the benefit of my previous medical records. Only after nine-months had passed, did the FCI-Ray Brook Defendants attempt tp obtain the Plaintiff's medical records from MDC-Brooklyn and from Lackawana County Prison (the Plaintiff does not know how long after the requests for the Plaintiff's medical records did the FCI-Ray Brook Defendants actually receive them).

31)     The medications that the FCI-Ray Brook Defendants prescribed to the Plaintiff had adverse effects, and the Defendants never examined the Plaintiff to determine either the cause, or if the Plaintiff was having an allergic reaction to these medications.

32)     After this nine-month period, the Plaintiff was finally taken to an outside Urologist for examination. An ultrasound was taken of the Plaintiff's testicular area to evaluate the growth of the cyst. The Urologist ordered that the Plaintiff sleep with a heating pads to aleviate the pain while undergoing treatment. Assistant Warden Defendant Doe # 3 (FCI-Ray Brook) refused the Plaintiff permission to have te heating pad, even though the Defendant is not a doctor and does not have any medical training (other than basic first aid and CPR it is assumed).

33)     The Plaintiff's current medical status is poor. The Plaintiff suffers from chronic testicular pain, which is

is sometimes so severe that it confines the Plaintiff to bed for an entire day at a time. At the current facility the Plaintiff is housed in, the medical staff prescribe a psychotropic medication to treat the pain (that was started by the Defendants at FCI-Ray Brook, and that the Plaintiff is now addicted to).

34)   To add insult to injury, the Plaintiff fears that the lack of treatment, and the delay in treatment, coupled with the medication experimentation of the FCI-Ray Brook Defendants, has left the Plaintiff sterile, and that the Plaintiff cannot now father any children.

## RELIEF REQUESTED

35)   The Plaintiff prays the Honorable Court to award the Plaintiff monetary damages in the amount of ten-million dollars, against the Defendants, for the Defendants infliction of cruel and unusual punishment on the Plaintiff by withholding necessary medical treatments.

36)   The Plaintiff prays the Honorable Court to award the Plaintiff monetary damages in the amount of ten-million dollars, against the Defendants, for the Defendants infliction of cruel and unusual punishment on the Plaintiff, by the misdiagnosis of the Plaintiff contracting Tuberculosis.

37)   The Plaintiff prays the Honorable Court to award the Plaintiff monetary damages in the amount of ten-million dollars, against the Defendants, for the Defendant's failures to prevent the violations of the Plaintiff's rights when the Defendant's had to opportunity to so prevent the violations, and willfully failed to do so.

38)   The Plaintiff prays the Honorable Court to award the Plaintiff monetary damages in the amount of fifty-million dollars, against the Defendants, for compensatory, exemplary, general, punitive and special damages, for the harms inflicted.

39)     The Plaintiff prays the Honorable Court to award the Plaintiff any other relief that the Honorable Court deems to be fair and just.

40)     The Plaintiff prays the Honorable Court to award the above damages to the Plaintiff against the Defendants, against the Defendants as individuals, and against the Defendants in their official capacities, against the Defendants jointly and severely.

## VERIFICATION

I, Kevin Dowdy, Plaintiff, Pro-Se, hereby affirms under the penalty of perjury pursuant to 28 U.S.C. § 1746, tha the above statements are true, of my own personal knowledge, except for those statements that are allegations, and as for those statements, which are based upon information and belief, I believe them to be true.

Dated: 5/31/07

Respectfully submitted,

*Kevin Dowdy*

Kevin Dowdy
Plaintiff, Pro-Se
Reg. # 11078-067
L.S.C.I. Allenwood
P.O. Box 1000
White Deer, PA. 17887-1000